FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

JULY 9, 2026

*Stgnec, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 9, 2026

*Sarah Pendleton*

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| JOCYLIN BOLINA; ADOLFO PAYAG; MADONNA OCAMPO; HONORINA ROBLES; HOLLEE CASTILLO; and REGINALD VILLALOBOS, <br><br> Respondents, <br><br> v. <br><br> ASSURECARE ADULT HOME LLC, a Washington Corporation; ASSURECARE ADULT FAMILY HOME LLC, a Washington Corporation; ASSURECARE FAMILY HOME CARE LLC, a Washington Corporation; MARCELINA S. MACANDOG, an individual; and GERALD MACANDOG, an individual, <br><br> Petitioners, <br><br> AMAZING HOME ADULT FAMILY HOME LLC, a Washington Corporation; And REGAL HOME CARE LLC, a Washington Corporation, <br><br> Defendants. | No. 103519-5 <br><br> En Banc <br><br><br> Filed: <u>July 9, 2026</u> |

MADSEN, J.[*]—The case concerns the constitutionality of former RCW 49.46.010(3)(j) (2013),[1] which exempts "live-in" workers from the Washington Minimum Wage Act (MWA), ch. 49.46 RCW. At issue is whether the trial court properly granted partial summary judgment to a class of caregivers at adult family homes in Washington: Jocylin Bolina, Adolfo Payag, Madonna Ocampo, Honorina Robles, Hollee Castillo, and Reginald Villalobos (collectively caregivers), who challenged the exemption under article I, section 12 of our state constitution. We affirm.

BACKGROUND

The caregivers lived and worked at different AssureCare adult family homes (AssureCare). These homes are owned and operated by Marcelina and Gerald Macandog.

AssureCare employed both live-in and shift (non-live-in) caregivers. These caregivers had various duties, including assisting residents with activities of daily life such as bathing, dressing, eating, toileting, and walking. The caregivers also cooked meals, cleaned the homes, performed basic maintenance, did laundry, bought groceries, transported residents to appointments, and performed administrative work. Residents at the adult family homes had various physical and cognitive limitations or diseases and required different levels of care.

---

[*] Justice Barbara Madsen is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

[1] The code reviser alphabetized the definitions in RCW 49.46.010. RCW 1.08.015(2)(k). Washington's current legislative website lists the live-in exemption in subsection (4). The parties refer to subsection (3), which was in effect at the time, and for the sake of clarity, we also refer to subsection (3) for the exemption throughout.

Caregivers would assist residents whenever needed, including at night. During the night, one caregiver generally performed "rounds," checking on patients, helping them to the bathroom, and repositioning them to prevent injuries. Clerk's Papers (CP) at 83, para. 8 (Decl. of Adolfo Payag). The caregivers' work schedules varied depending on the day and facility, but they typically started in the early morning (5:00 or 6:00 a.m.) and lasted until night (10:00 p.m. or midnight), when they went to sleep. Generally, two caregivers were on duty during the day and one at night. The caregivers' sleep, rest, and meal breaks were often interrupted by resident needs. Some caregivers worked seven days a week.

The caregivers received room and board at the adult family homes. They did not pay rent, utilities, Internet, or food costs, and they had access to a vehicle. The caregivers' family members and significant others were also allowed to live in the homes without contributing to household expenses. The caregivers were paid a flat rate, regardless of the hours they worked. Their daily pay rate varied, ranging from $110 to $145. AssureCare did not keep employment documents or maintain records for meal periods, rest breaks, and sick or other personal leave taken.

In 2023, the caregivers sued AssureCare for violating the MWA, among other things. Their amended complaint alleged that AssureCare failed to pay minimum wage for all hours worked and overtime, and did not provide meal breaks, rest breaks, or sick leave. The caregivers sought declaratory judgment that the live-in exemption, former RCW 49.46.010(3)(j), violates the privileges and immunities clause and the equal protection clause of our state constitution. WASH. CONST. art. I, § 12.

The caregivers moved for partial summary judgment on the exemption's constitutionality under the privileges and immunities clause as applied to live-in caregivers. They claimed that they often worked over 40 hours a week in highly dangerous conditions pursuant to article II, section 35. The motion was denied. The trial judge found that the caregivers had not proved that their occupation was dangerous. The caregivers submitted an expert report and again moved for partial summary judgment, seeking the same relief. Like the dairy workers in *Martinez-Cuevas v. DeRuyter Bros. Dairy*, 196 Wn.2d 506, 475 P.3d 164 (2020), the caregivers argued that they worked 24 hours a day, 7 days a week in a dangerous occupation and therefore they had a fundamental right to MWA protections. They argued that the MWA incorporated the Fair Labor Standard Act of 1938's (FLSA) exclusion of domestic workers, like live-in caregivers, to prevent Black and female workers—who make up the majority of those providing domestic labor—from gaining political power. They further argued that no reasonable ground existed for exempting live-in workers.

AssureCare opposed summary judgment. AssureCare disputed that the live-in exemption violated article I, section 12, arguing that the exemption does not involve a fundamental right. AssureCare also argued that article II, section 35 did not grant a specific right to workers in dangerous jobs and instead required only that the legislature enact health and safety laws. Even so, AssureCare contended that the caregivers failed to show their occupation was dangerous, pointing out that some of the caregivers' evidence did not distinguish adult family homes from other long-term care facilities. AssureCare then argued that reasonable grounds existed for the exemption because it serves the

legislature's stated goals: the regulations for adult family homes recognize the unique nature of adult family homes by requiring a live-in employee, and live-in caregivers receive other benefits such as room and board. Finally, if the court struck the exemption, AssureCare urged that conclusion be applied prospectively.

The trial court granted the caregivers' motion for partial summary judgment, concluding that the live-in exemption violated article I, section 12. The court applied *Martinez-Cuevas* to conclude that caregiving is a dangerous industry pursuant to article II, section 35 and requires MWA protections of minimum wage and overtime. The court relied on the caregivers' expert testimony and research that the caregiving industry presents a high risk of injury, the plaintiffs were injured, they worked long hours, and they were sleep deprived. The court also concluded that no reasonable ground existed for the exemption, finding that in the absence of legislative justification for the exemption, it likely was rooted in the historically racist and misogynistic exclusion of domestic work. The court declined to decide prospectivity, noting it would need to consider the potential prejudice to the defendants among other things.

In September 2024, the trial court certified its ruling as involving a controlling question of law for which there is a substantial ground for a difference of opinion. AssureCare sought discretionary review here and filed a statement of grounds in support. The caregivers' complaint raised numerous issues, including whether the live-in exemption violates equal protection under article I, section 12. However, the only issue

currently before us is whether former RCW 49.46.010(3)(j) violates the privileges and immunities clause of our state constitution.[2]

We received two amici curiae briefs in support of the caregivers from Washington Employment Lawyers Association (Amici Br. WELA) and the American Civil Liberties Union of Washington Foundation, Center for Civil Rights and Critical Justice, National Employment Law Project, National Women's Law Center, National Domestic Workers Alliance, and Pilipino Workers Center.

## ANALYSIS

We review a summary judgment order de novo, engaging in the same inquiry as the trial court. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008) (citing *City of Sequim v. Malkasian*, 157 Wn.2d 251, 261, 138 P.3d 943 (2006)). Summary judgment is proper if the record shows "'there is no genuine issue as to any material fact'" and the moving party is entitled to judgment as a matter of law. *Id*. (internal quotation marks omitted) (quoting *Locke v. City of Seattle*, 162 Wn.2d 474, 483, 172 P.3d 705 (2007)); CR 56(c). We review a trial court's conclusions of law, including its interpretations of statutes and constitutional provisions, de novo. *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

---

[2] Amici urge us to consider the claim under equal protection and decide it under either strict or heightened scrutiny. Amici Br. of Am. C.L. Union of Wash Found. et al. at 23-31. The trial court did not address that issue. It was not raised in the parties' filings related to the statement of grounds nor did the parties argue it in their supplemental briefing in this court. We decline to address this issue since it is raised only by amici and remains a live issue in the trial court.

Article I, Section 12

Article I, section 12 of the Washington State Constitution provides, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

We have recognized that article I, section 12 is more protective than its federal counterpart and requires a different analysis when a law implicates a "'fundamental right[]'" of state citizenship. *Schroeder v. Weighall*, 179 Wn.2d 566, 572, 316 P.3d 482 (2014) (internal quotation marks omitted) (quoting *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 812-13, 83 P.3d 419 (2004)). In those situations, we have applied a two-step analysis: (1) we ask whether a challenged law grants a privilege or immunity for purposes of the state constitution and (2) if so, whether there is a reasonable ground for granting that privilege or immunity. *Id*. at 572-73. "Benefits triggering this analysis are *only* those implicating fundamental rights of state citizenship." *Martinez-Cuevas*, 196 Wn.2d at 519 (emphasis added).

Thus, our first inquiry is whether this case implicates a fundamental right of state citizenship. The caregivers contend they have such a right to legislative protection for jobs that are dangerous to life or deleterious to health under article II, section 35. We agree.

1. Fundamental Right of State Citizenship

Article II, section 35 provides, "PROTECTION OF EMPLOYEES. The legislature shall pass necessary laws for the protection of persons working in mines,

factories and other employments dangerous to life or deleterious to health; and fix pains and penalties for the enforcement of the same."

The caregivers contend that the fundamental right in this case is the same as that in *Martinez-Cuevas*—caregiving, like dairy work, is a dangerous profession requiring article II, section 35's protections. 196 Wn.2d at 520. In *Martinez-Cuevas*, milkers worked around the clock to service 3,000 dairy cows, resulting in a significant injury rate for Washington dairy workers. *Id.* Injuries included physical strains and diseases. *Id.* This court noted that overtime for dairy workers was particularly hazardous, resulting in increased injuries, illness, and even mortality. *Id.*

Live-in caregiving at adult family homes, like the dairy workers in *Martinez-Cuevas*, constitutes dangerous work. *See id.* The caregivers have provided evidence of significant musculoskeletal injuries sustained by assisting residents with activities of daily life including moving, transporting, and lifting residents from beds, bathrooms, and wheelchairs. CP at 460 ("A high share (88.4%) of nursing assistants working in nursing homes report work-related musculoskeletal symptoms."), 461 ("Caregivers at [residential care settings without skilled nursing (like an adult family home)] experienced 44.07 intentional injuries per 10,000 workers."), 464-67 (reviewing plaintiff caregiver declarations indicating numerous physical injuries lifting and transferring patients). Caregivers were required to respond to resident needs day or night, resulting in shifts that exceeded 24 hours, with many of the caregivers working 7 days a week. The evidence presented demonstrates that caregivers who lived at AssureCare homes, working 24-hour shifts, did not get sufficient sleep and that research studies "link working the night shift to

sleep problems, overall poor health, depression, and increased risk for workplace injuries." CP at 471.

AssureCare argues that *Martinez-Cuevas* is distinguishable. AssureCare contends that a categorical exemption for agricultural workers denied the dairy workers their fundamental right in *Martinez-Cuevas* whereas the live-in exemption here applies only to adult family home caregivers who accept employment requiring them to live where they work. This exemption is, in AssureCare's view, "essentially a book-keeping" function, allowing adult family homes to compensate live-in caregivers differently, which does not implicate a fundamental right. Br. of Pet'r at 21-22. But this argument does not address whether live-in caregiving is constitutionally dangerous as applied to those working in the industry.

To that end, AssureCare asserts that caregiving is not dangerous based on the low rate of injury for workers at its adult family homes. The injury rate for specific workplaces is not the only consideration in an article I, section 12 claim based on a fundamental right to health and safety protections pursuant to article II, section 35. The caregivers modeled their case after that of the *Martinez-Cuevas* dairy workers, which this court understood to be an as-applied challenge. 196 Wn.2d at 525. In that case, our inquiry focused on the dairy industry as a whole while recognizing the hazardous nature of the job to individual plaintiffs. *Id.* at 520-21. AssureCare does not meaningfully

dispute the caregivers' evidence that the industry requires live-in caregivers to work long hours, doing physically injurious work while routinely sleep deprived.[3]

As workers engaged in a dangerous industry, the caregivers are entitled to health and safety protections. WASH. CONST. art. II, § 35. In *Martinez-Cuevas*, we held that this constitutional provision imposes a duty on the State to enact statutory protections for such workers. 196 Wn.2d at 520 ("[A]rticle II, section 35 *requires* the legislature to pass appropriate laws for the protection of workers.").

This type of constitutional duty is not unique. Article IX, section 9 imposes a similar duty in the context of public education for Washington children. *McCleary v. State*, 173 Wn.2d 477, 514, 269 P.3d 227 (2012); WASH. CONST. art. IX, § 1.[4] *McCleary* explored the roles played by different branches of government regarding this constitutional duty, noting that while it is the judiciary's responsibility to "'say what the law is,'" the legislature has the responsibility to implement the law as interpreted by this court. 173 Wn.2d at 514-15 (internal quotation marks omitted) (quoting *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 496, 585 P.2d 71 (1978)). Specifically, the legislative branch is "'uniquely constituted'" to carry out fact-finding and opinion gathering in addressing difficult policy questions, such as how to provide a constitutionally adequate education. *Id.* at 517 (quoting *Seattle Sch. Dist.*, 90 Wn.2d at 551). In short, "'the Legislature must *act* pursuant to the constitutional mandate to discharge its duty, [but] the

---

[3] Nor does AssureCare dispute that the case is an as-applied constitutional claim.

[4] "It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex."

general authority to select the *means* of discharging that duty should be left to the Legislature.'" *Id.* (quoting *Seattle Sch. Dist.*, 90 Wn.2d at 520).

Respecting this division of responsibility, we accord the legislature full latitude to implement its constitutional mandate. *See id.* at 516-17. In *Martinez-Cuevas*, we recognized that the legislature complied with its article II, section 35 duty when it enacted *one type* of necessary worker protection "in the form of the Minimum Wage Act." 196 Wn.2d at 521. We did not, however, conclude that workers in dangerous or injurious professions have a fundamental right to the MWA *itself*.[5]

Like *Martinez-Cuevas*, the MWA is the only applicable legislative enactment on worker health and safety in this case. The caregivers do not argue otherwise. While the adult family home industry is, as AssureCare notes, heavily regulated, those regulations overwhelmingly concern the health and safety of residents—not live-in caregivers. *E.g.*, RCW 70.128.007(1)-(2) (the purpose of regulating adult family homes is to ensure provision of a humane, safe, and residential home environment for persons with functional limitations and establishing regulations that adequately protect residents), .010(9), .130 (adult family home providers must promote health, safety, and well-being of residents), .100 (licenses can be suspended if conditions constitute an imminent danger to residents).

---

[5] To the extent the caregivers and amici make this argument, we reject it. *See* Resp'ts' Answering Br. at 35 ("the fundamental right to the protections of the MWA applies to workers in [dangerous] occupations"); Amici Br. WELA at 1 (arguing that caregivers "have a fundamental right to MWA protections").

AssureCare states that it already provides basic worker protections like meal breaks and sick leave, as well as unique benefits of free room and board to live-in caregivers and their family members. But AssureCare is not bound by law to provide *any* of these protections. If these benefits and protections had been codified, the case before us may be different. As it stands, the record here does not demonstrate protections for worker health and safety. The caregivers describe substandard sleeping and living conditions. CP at 103, para. 7 (Decl. of Honorina Robles) ("[M]y sleeping area was a recliner in the TV room. I put cardboard in the sliding glass door so that people outside couldn't see me sleeping."), 83, para. 5 (Decl. of Adolfo Payag) ("I slept on a recliner or the floor in the common area of the home."). AssureCare did not record rest and meal breaks or sick and vacation leave. Caregivers were required to respond to all resident needs whenever they occurred, routinely resulting in caregivers working 24 hours without meaningful opportunities for sleep, breaks, or meals.

Thus, if we adopted AssureCare's view, there would be no statutory or regulatory framework to ensure that workers in a dangerous industry receive basic (let alone unique), constitutionally mandated workplace safety protections.

The caregiver plaintiffs have established that live-in caregiving at adult family homes constitutes a dangerous profession. Therefore, the caregivers have demonstrated a fundamental right to statutory safeguards as provided in the MWA. *See Martinez-Cuevas*, 196 Wn.2d at 521 ("Article II, section 35 creates the fundamental right of state citizenship to laws such as the [MWA] that protect the health and safety of dairy workers.").

2.  Privilege or Immunity

Our next inquiry is whether the challenged law grants a privilege or immunity. *Schroeder*, 179 Wn.2d at 572.  Because live-in caregiving at adult family homes is a dangerous profession requiring workplace safeguards in the form of the MWA, former RCW 49.46.010(3)(j)'s exemption grants adult family care homes immunity from otherwise mandatory labor standards and the privilege of paying lower labor costs.  *See Martinez-Cuevas*, 196 Wn.2d at 522.

3. Reasonable Grounds

The final inquiry in our article I, section 12 analysis asks whether reasonable grounds exist for granting the privilege or immunity.  *Schroeder*, 179 Wn.2d at 573.  Under the reasonable ground test, a court will not hypothesize facts justifying a legislative distinction.  *Id*. at 574.  Instead, a court will scrutinize the legislative distinction to determine whether it serves the legislature's stated goals in fact and theory.  *Id*.  The heightened scrutiny of the reasonable ground test does not subject every legislative distinction to courtroom fact-finding.  *Bennett v. United States*, 2 Wn.3d 430, 449, 539 P.3d 361 (2023) (quoting *DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136, 147, 960 P.2d 919 (1998)).

The MWA is a remedial law that "establish[es] minimum standards of employment within the state of Washington."  RCW 49.46.005(1).  Its purpose is to protect the "health, safety and welfare of the people of this state."  *Id.* "This purpose underlies the entirety of the act, including the overtime pay protections and exemptions." *Martinez-Cuevas*, 196 Wn.2d at 525.

13

This court has examined the live-in exemption and concluded that it concerns how an individual spends a substantial portion of their work time. *Berrocal v. Fernandez*, 155 Wn.2d 585, 592, 121 P.3d 82 (2005). We recognized the accounting and practical difficulties of calculating working time for individuals who reside where they work. *Id.* at 597-98 (holding sheepherders who live where they work are exempt); *see also Strain v. W. Travel, Inc.*, 117 Wn. App. 251, 256-57, 70 P.3d 158 (2003) (same for overnight cruise ship workers). Therefore, we concluded that the exemption is a legislative recognition that the nature of certain occupations does not lend itself to the standard 40-hour work week and traditional compensation models. AssureCare echoes this explanation and warns that requiring minimum wage and overtime pay would destabilize the adult family homecare industry.

But this reasoning does not address the dangerous nature of live-in caregiving at adult family homes. Dangerousness is the lodestar of the caregivers' challenge to former RCW 49.46.010(3)(j), as well as this court's constitutional analysis. WASH. CONST. art. I, § 12; art. II, § 35. Considering that danger and the legislative duty to protect workers in such an industry as we must, former RCW 49.46.010(3)(j) exempts employees who live on-site from the protections of the MWA. In short, the exemption denies basic health and safety protections to live-in caregivers. An accounting principle and the potential for negative financial consequences are not reasonable grounds for denying constitutionally required safeguards set out in the MWA. *See Schroeder*, 179 Wn.2d at 573.

The caregivers contend the historical exclusion of domestic workers from federal labor protections suggests the live-in exemption's true basis is rooted in discrimination. It is unclear whether the caregivers' argument is relevant to their equal protection challenge, which is still pending in the trial court, or whether the argument is advanced to demonstrate that there is no reasonable basis for the exemption under a privileges and immunities analysis. WASH. CONST. art. I, § 12; *Martinez-Cuevas*, 196 Wn.2d at 515 (recognizing article I, section 12 is consistent with the federal equal protection clause).

As noted, the caregiver's equal protection claim is not before us today. We are asked only whether the live-in exemption violates article I, section 12's privileges and immunities clause, implicating a fundamental right of state citizenship pursuant to article II, section 35's protections for inherently dangerous occupations. We must consider reasonable grounds in that context. To that end, we conclude that former RCW 49.46.010(3)(j) exempts live-in caregivers from constitutionally mandated worker safeguards on the basis of an accounting principle. This is not a reasonable ground for the exemption.[6]

---

[6] The caregivers correctly note that the former exclusion of domestic workers in the definition of "employee" under both the FLSA and Washington's MWA demonstrates a disturbing history of racism and sexism. *E.g.*, Juan F. Perea, *The Echoes of Slavery: Recognizing the Racist Origins of the Agricultural and Domestic Worker Exclusion from the National Labor Relations Act*, 72 OHIO ST. L.J. 95, 100, 114-121 (2011). As the caregivers correctly point out, the MWA was patterned after the FLSA and initially excluded domestic workers. *See Martinez-Cuevas*, 196 Wn.2d at 512-13 (citing *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 281 P.3d 289 (2012) (recognizing the MWA definition of "employee" was based on the FLSA)); LAWS OF 1959, ch. 294, § 1(5)(b); 29 U.S.C. § 152(3) (excluding from "'employee' . . . any individual employed . . . in the domestic service of any family or person at his home"). However, we need not decide whether the live-in exemption reflects a similar racial or sexist motivation given our resolution of the issue presented.

For the reasons discussed above, we affirm the trial court's ruling granting partial summary judgment. The caregivers demonstrated a fundamental right to health and safety protections enshrined in article II, section 35 in the form of the MWA. Former RCW 49.46.010(3)(j) granted an immunity to adult family homes from complying with otherwise mandatory labor standards and the privilege of paying lower labor costs. The only basis for this exemption is an accounting function for compensating nontraditional workers. For nondangerous occupations, this bookkeeping function is reasonable. For live-in caregiving at adult family homes, however, it is not a reasonable ground justifying the denial of basic worker safeguards.

Accordingly, we hold that former RCW 49.46.010(3)(j) violates article I, section 12 as applied to live-in caregivers.

Prospective Application

The parties also disagree whether today's decision should apply prospectively or retroactively. AssureCare urges us to apply the decision only prospectively, while the caregivers contend the issue is not properly before the court. We agree with the caregivers.

As a preliminary matter, AssureCare did not argue that prospectivity meets any of the criteria for this court's review outlined in RAP 2.3 or 4.2. RAP 2.3(a) provides that "a party may seek discretionary review of any act of the superior court not appealable as a matter of right." Discretionary review is accepted "only" in certain circumstances. RAP 2.3(b). Relevant here, the superior court certified, and the parties stipulated, that the order involves a controlling question to which there is a substantial ground for a

difference of opinion and immediate review advances the conclusion of litigation. RAP 2.3(b)(4). Similarly, RAP 4.2 allows discretionary review of a superior court's order "only" for enumerated reasons, such as when a trial court invalidates a statute as unconstitutional. RAP 4.2(a)(2). As noted, the superior court's summary judgment ruling did not consider prospectivity; thus, it was not part of the ruling certified to this court. Nor does the constitutionality of the live-in exemption require resolution of that issue. While prospectivity may satisfy other grounds for this court's review, AssureCare argued only RAP 2.3(b)(4) and RAP 4.2(a)(2)—neither of which references or contemplates prospective application of a court's ruling.

Further, the central question before this court is on the merits of the constitutionality of the live-in exemption. As stated above, the issue came before us on the trial court's grant of summary judgment. The trial court did not, however, reach prospectivity. The parties stipulated that the ruling be certified to this court for immediate review. While AssureCare raised prospectivity in its briefing here, the fact remains that the trial court did not consider it. Further, prospectivity relates to the scope of remedy rather than the merits. This procedural question therefore remains a live issue in the trial court, and it is premature for us to weigh in.

## CONCLUSION

The live-in exemption in former RCW 49.46.010(3)(j) violates article I, section 12 of the Washington State Constitution as applied to live-in caregivers at adult family homes. We affirm partial summary judgment and remand to the trial court for further proceedings consistent with this opinion.

No. 103519-5

_____
Madsen, J.P.T.

WE CONCUR:

_____     _____
Stephens, C.J.                            Montoya-Lewis, J.

                                               _____
                                               Whitener, J.

_____
González, J.

_____     _____

No. 103519-5

MUNGIA, J. (concurring)—Life was harsh for workers before the federal and state governments enacted minimum wage laws.  Workers routinely worked 60 hours or more per week, 6 days a week, with no scheduled breaks, and no paid sick leave.  These conditions were detrimental to workers' health, and in some occupations, the work posed a danger to their lives.

In 1959, the Washington Legislature addressed these conditions by enacting the Washington Minimum Wage Act (MWA), ch. 49.46 RCW.  The purpose of the act was to protect the health, safety, and welfare of workers by establishing minimum employment standards.  Those standards include fair wages, a 40-hour work week, overtime pay, and paid sick leave.  RCW 49.46.020.

Excluded from the MWA's protections, however, are people who work as live-in employees in adult family homes (AFHs).  AFHs do not need to employ live-in caregivers.  There are AFH workers that come into work, complete their shift, and then go home.  They do the same work as live-in caregivers.  However, despite doing the same work, AFH shift workers receive MWA protections while live-in caregivers do not.  This disparity is due to the MWA's live-in worker exemption.

The plaintiff caregivers here are AFH live-in caregivers employed by AssureCare Adult Home LLC. Without the MWA's protections, the caregivers in this case routinely worked more than 40 hours a week, were not paid overtime, and were not given uninterrupted breaks while working these excessive hours. Indeed, these workers were required to work up to six to seven days a week, from at least 6:00 a.m. to 10:00 p.m. Even during their sleeping hours, they were required to wake up to respond to residents' needs.

These were not simply allegations; instead, they were undisputed facts. These working conditions, that are common to AFH live-in caregivers, resulted in their occupation being deleterious to their health.

Article II, section 35 of the Washington Constitution requires the legislature to pass laws to protect people working in jobs that are dangerous to their lives or deleterious to their health. While the majority discusses the former, it does not address the latter. Workers whose jobs do not put their lives in danger but are deleterious to their health are still protected under article II, section 35.

The caregivers argue that by exempting AFH live-in workers from the MWA, the legislature has provided a privilege to the AFH industry that violates article I, section 12 of the Washington Constitution—the privileges and immunities clause. The trial court found that undisputed evidence demonstrated such a violation. The trial court's ruling was correct. I would affirm.

I.

THE UNDISPUTED EVIDENCE DEMONSTRATED THAT THE LIVE-IN CAREGIVERS' WORKING CONDITIONS WERE DELETERIOUS TO THEIR HEALTH

The following facts were undisputed by AssureCare on summary judgment.

A. The Caregivers' Evidence

1. *Individual Caregiver Declarations*

a. Long Working Hours and Sleep Deprivation

One of the caregivers' main duties was to provide around-the-clock care to medically fragile and elderly patients at the AFHs. The caregivers would frequently be scheduled for 24-hour shifts, multiple days a week. They would begin daily tasks around 6:00 a.m. and not get to bed until 10:00 p.m. or later. Any breaks they tried taking during their shifts were often interrupted. One caregiver shared:

> I rarely had downtime when I worked for AssureCare. I often ate meals really quickly or on the go because I didn't have time to sit down. During waking hours I almost never had an opportunity to sit down because I had to be aware of what my patients were doing.

Clerk's Papers (CP) at 139. This was a common experience.

After the day's work, the caregivers would put the patients to bed and spend the rest of the evening tending to the house's upkeep. When the caregivers could finally go to bed around 10:00 p.m. or later, they rarely got uninterrupted sleep. They were required to be on call and to respond to residents' needs throughout the night. During the night, residents would frequently call for help, wander or fall out of bed, or otherwise need immediate assistance. There were several patients with dementia who experienced "sundowning" at times, requiring a caregiver to be with them throughout the night.

3

The live-in caregivers only had a few hours of continuous sleep at night. One caregiver shared:

> Even when I was sleeping, I was not able to fully relax into my sleep because I had to remain constantly vigilant in case a patient had an emergency or a need arose. If myself or the other caregiver didn't respond to those needs, we knew that it could have potentially life threatening consequences to the individuals in our care.

CP at 100. The caregivers' routine lack of sleep contributed to health issues such as insomnia, stress headaches, blurred vision, stomachaches, mental health issues, and constant fatigue. One caregiver explained:

> I was often so tired that I had to fight my body's natural urge to completely shut down. There were times when I was working that I would fall asleep in the middle of a task because my body gave me no choice but to switch off. My body would just shut down.

CP at 100. Another caregiver also testified to the toll that the sleep deprivation took on him and his work:

> There was something particularly challenging about the lack of sleep and knowing that I had no choice but to push through because nobody was coming to relieve me. At times it made me really cranky and caused me to have anxiety. I could feel the physical toll on my body as well. Without sleep the tasks felt physically more challenging. One of my fears was driving while tired, I was asked to drive between locations when I was so tired and it was scary.

CP at 142.

Working 16 hours a day, 5 or more days a week, with no uninterrupted sleep is deleterious to anyone's health.

b.  Musculoskeletal Injuries

The caregivers also suffered injuries from frequently lifting and transferring residents.  Most of the patients weighed over 200 pounds, some weighing over 300 pounds.  Even with a lifting machine or another caregiver's assistance, transferring residents was strenuous.  There were also many times caregivers would have to lift a resident without equipment or another caregiver, placing even more stress on their bodies.  It was especially difficult to lift residents if they unexpectedly fell or were resistant to assistance.

Altogether, the caregivers reported persistent back, shoulder, and knee injuries from lifting.  One caregiver noted that "[m]y muscles often felt stiff or sore and I frequently experienced discomforts in my body."  CP at 142.  Another shared:

> I was in physical therapy for about a year and a half after AssureCare fired me, but it didn't help much.  I still need a walker and can't move around for more than ten minutes before I start losing my balance.  I also can't stand longer than ten minutes without needing to sit down.

CP at 108.  The caregivers' daily job duties left lasting impacts on their bodies.

c.  Exposure to Biohazards and Illnesses

Because the caregivers had to be in close contact with the residents, they were also frequently exposed to biohazards and illnesses.  For instance, they were required to shower residents, change diapers, and clean wounds.  As a result, the caregivers were regularly exposed to feces, urine, blood, and vomit.  There were also times that caregivers would be pricked by insulin needles when administering medicine because it was hard for patients to remain still.

5

In addition, the caregivers had to take care of residents when they were ill. This exposed them to illnesses such as colds, flus, and COVID-19. The caregivers were also exposed to residents with highly contagious diseases like hepatitis and MRSA—a strain of staph bacteria that has become antibiotic resistant.

### d. Verbal and Physical Abuse

It was not uncommon for the caregivers to face verbal and physical abuse from patients when they became upset or confused. Patients with dementia or other mental health conditions would frequently slap, hit, push, kick, and spit on caregivers, sometimes leaving bruises.

Overall, the caregivers' declarations highlighted routine risks and harms suffered by live-in caregivers at AFHs.

### 2. *Expert Testimony, Studies, and Data*

The expert report of David C. Grabowski, PhD, confirmed that the dangers and harms that the caregivers faced were common in their industry. Dr. Grabowski noted that long-term care settings like AFHs put workers at a heightened risk of occupational injuries, infections, and workplace assaults. Dr. Grabowski cited numerous studies supporting his conclusions.

One published review outlined job hazards for home health care workers, including work-related musculoskeletal disorders like back injuries, severe and frequent violence from patients, sharps injuries and bloodborne pathogen exposures, and infection

hazards.  Looking to reported injuries and studies surrounding home care (HC) workers,

the review summed up:

> The patterns of compensable injuries did not vary importantly among
> different types of HC services (home health services, personal care services
> provided by agency-hired aides or personal care services provided by
> consumer-hired aides).  The authors concluded that all HC providers likely
> experienced similar injury risk factors.  The great majority of injuries
> resulting in workers' compensation claims were work-related
> musculoskeletal disorders (WMSD), followed by falls on the same level
> and injuries due to violence.  Struck-by injuries and transportation injuries
> also resulted in high costs and lost work time.

CP at 442.

National data further reveal that assisted living facilities for the elderly and

residential care facilities have some of the highest incident rates of nonfatal occupational

injury and illness cases.  Looking to Washington specifically, workers' compensation

claim data reveal that the rate of compensable claims for assisted living facilities, AFHs,

and retirement centers was about 33 percent higher than the number of compensable

claims for all industries statewide and 25 percent higher than the healthcare industry as a

whole.  The two leading causes of injury for these claims were work-related

musculoskeletal disorders and exposures to harmful substances or environments.

B. AssureCare Did Not Dispute Any Material Facts

AssureCare and the dissent incorrectly argue that there were disputed material

facts.

The dissent begins by arguing that in "a summary judgment motion, the trial court

must evaluate the pleadings, depositions, answers to interrogatories, admissions on file,

and affidavits." Dissent at 2. That is not accurate. The pleadings are not evidence and are not considered unless they are verified pleadings. CR 56(e); *Stringfellow v. Stringfellow*, 53 Wn.2d 639, 641, 335 P.2d 825 (1959). As to the rest, the trial court considers depositions, answers to interrogatories, admissions on file, and affidavits only if a party has submitted those in support of, or in opposition to, the motion. AssureCare did not submit any discovery materials. Instead, it provided only the three following declarations to the trial court to oppose the caregivers' summary judgment motion.

First, AssureCare submitted the declaration of John Ficker, the executive director of Adult Family Home Council of Washington State. Mr. Ficker did not dispute any of the caregivers' testimony. Instead, he discussed the industry and how AFHs benefit their residents: "Adult family homes are quickly becoming the premier option for long-term care in the state of Washington." CP at 24. Mr. Ficker testified that owners of AFHs could not afford to provide the pay and benefits that the MWA requires: "It would be cost prohibitive for owners of AFHs who employ live-in employees to comply with MWA due to the expense." CP at 28.

None of the testimony provided by Mr. Ficker contested that AFH live-in caregivers work in conditions dangerous to life or deleterious to health. On the contrary, Mr. Ficker testified to the "24/7 nature" of AFH caregiving work, supporting the caregivers' contentions. CP at 26. As for his remaining testimony, the fact that residents enjoy living in AFHs does not impact the caregivers' working conditions. And the fact that protecting the workers' health might make the operation of an AFH no longer viable

under a certain business model is not part of the privileges and immunities clause

analysis.

Second, AssureCare submitted a declaration by Mariann McKee, a registered

nurse who testified to the benefits AFHs have for their residents. Yet, Ms. McKee also

admitted that the caregiving industry is prone to injuries:

> It is no secret that the Health Care industry, is prone to injuries. The industry, largely led by women, who are tasked with bending, stooping, transferring, and managing patients with Dementia and physical impairments are going to get hurt. As a CNA, I had my first back injury my senior year of nursing school, while maneuvering a patient in a wheelchair, I herniated a disk. My story is not atypical. Each year, there are injuries to those who are providing care.

CP at 580.

Ms. McKee did not present any evidence contesting the caregivers' evidence.

Instead, Ms. McKee's declaration supported the conclusion that the occupation is

deleterious to workers' health.

Third, AssureCare submitted the declaration of Marcelina Macandog.

Ms. Macandog owned the AFHs where the caregivers worked. Her testimony regarding

the caregivers' working conditions consisted of the following:

> 8. The Plaintiffs only lived on site and provided residential care at the AFHs because they accepted employment for that purpose. They were at-will employees who could quit and leave at any time.
>
> . . . .
>
> 11. Plaintiffs never reported to me that they were injured while working at the AFHs.

12. Only one AFH employee has had a work-place injury in the sixteen years that I have owned and operated the AFHs. This is reflected by the fact that the AFHs collectively have had only one workers' compensation claim. It was a minor injury to the employee's elbow that required only one doctor's visit.

. . . .

16. Plaintiffs were not required to work 24-hour shifts. There is just a requirement for 24 hour per day staffing, and shifts were assigned accordingly.

17. Plaintiffs were allowed to take meal breaks and rest breaks and they took them. If a break was interrupted to provide care to a resident, Plaintiffs were able to return to their break once the immediate need was taken care of.

18. There was not constant work to be done at my AFHs and because Plaintiffs lived where they worked they were able to take more breaks.

19. Plaintiffs were paid a flat rate per day and submitted their hours to me for payment.

. . . .

29. Plaintiffs were provided with vacation and sick leave.

CP at 566-68.

Ms. Macandog did not dispute that the employees worked long hours with uninterrupted breaks, just that they did not work a full 24 hours. Ms. Macandog also did not dispute that the workers experienced injuries and health issues, just that they were not reported to her or to workers' compensation.

10

These three declarations were the only evidence that AssureCare submitted to oppose the caregivers' second summary judgment motion. AssureCare did not submit any evidence disputing the following:

- Each of the caregivers worked between five and seven days every week.

- The caregivers worked from at least 6:00 a.m. to 10:00 p.m.

- The caregivers did not receive regular uninterrupted breaks or meal periods.

- The caregivers were not allowed to sleep without being interrupted at night.

- The caregivers' routine lack of sleep contributed to health issues such as insomnia, stress headaches, blurred vision, stomachaches, mental health issues, and constant fatigue.

- The caregivers faced verbal and physical abuse from residents when the residents became upset or confused.

- Residents with dementia or other mental health conditions would frequently slap, hit, push, kick, and spit on caregivers, sometimes leaving bruises.

- The caregivers were frequently exposed to feces, urine, blood, and vomit.

- The caregivers were exposed to needle pricks when administering medicine because residents would not remain still.

- These types of harms are common in the caregiving industry, with an even higher risk for home caregiving workers.

These undisputed facts demonstrate that working as an AFH live-in caregiver is deleterious to workers' health.[1]

## II.
### THE MINIMUM WAGE EXEMPTION THAT THE STATE GAVE TO AFHS AS TO LIVE-IN WORKERS VIOLATED OUR PRIVILEGES AND IMMUNITIES CLAUSE

The caregivers brought both a facial challenge and an as-applied challenge to the MWA's live-in worker exemption. The trial court found that the facial challenge failed. The caregivers did not appeal that ruling. However, the trial court did rule that the statutory exemption violated the privileges and immunities clause as applied. AssureCare appeals that ruling, and that is the only issue before us.

We review the trial court's ruling de novo.

In determining whether the live-in worker exemption at RCW 49.46.010(4)(j)[2] violates the privileges and immunities clause as applied, we use a two-part test.

1.  First, we examine the statute to determine whether it grants a privilege or immunity for purposes of our state constitution.

2.  Second, if yes, then we must determine whether the legislature had a reasonable basis for granting that privilege or immunity.

*Martinez-Cuevas v. DeRuyter Bros. Dairy*, 196 Wn.2d 506, 519, 475 P.3d 164 (2020).

---

[1] The dissent asserts that the caregivers had the burden of demonstrating that their working conditions posed an extreme danger to their lives. Dissent at 3-4. Article II, section 35 does not require that an extreme danger exist.

[2] The parties and majority cite to the previous version of RCW 49.46.010 that has the live-in exemption at former RCW 49.46.010(3)(j) (2013). I refer to the current version of the live-in worker exemption found at RCW 49.46.010(4)(j) for currentness. LAWS OF 2026, ch. 15, § 13.

A. <u>The Live-in Worker Exemption Grants AFHs a Privilege</u>

RCW 49.46.010(4)(j) gives AFHs the privilege of being exempted from providing live-in caregivers with the same statutory protections that most every other Washington worker receives under the MWA. This exemption is unconstitutional as applied to AFH live-in caregivers because of article II, section 35's requirement that the legislature enact laws to protect people working in jobs that are dangerous to their lives or deleterious to their health.

<u>AFHs Live-in Caregivers Work Jobs That Are Deleterious to Their Health</u>

I agree with the majority's conclusion that AFH live-in caregivers are engaged in a profession that falls under article II, section 35's protections. However, the majority rests its holding on the first prong of article II, section 35 by concluding that the caregivers' jobs are dangerous to their lives. The dissent disputes this.

Regardless of whether AFH live-in caregiving is dangerous to workers' lives, I would hold that the caregivers are covered under article II, section 35's second prong—covering jobs that are deleterious to workers' health.

As the undisputed evidence shows, AFH live-in caregivers' working conditions are certainly deleterious to their health. Working 6 to 7 days a week, 16 hours a day with no set time for breaks or lunch, and regularly having sleep disturbed is deleterious to workers' health. Developing musculoskeletal injuries, being regularly exposed to diseases and biohazardous materials, as well as being verbally and physically assaulted is also deleterious to workers' health. For all these reasons, our constitution requires that

AFHs provide live-in caregivers with the same MWA protections that most other Washington workers receive. AFHs constitutionally cannot be exempt from laws designed to protect workers in harmful situations like these.

B. <u>The Legislature Did Not Have a Reasonable Basis for Granting the Owners of AFHs the Privilege of Being Exempt from the MWA Regarding Employment of Live-in Caregivers</u>

It is important to note that AFHs are not exempt from the MWA for its non-live-in employees. Those employees, who perform the same tasks as the live-in employees, are guaranteed uninterrupted breaks and extra pay for working in excess of 40 hours a week. The legislature did not have a reasonable ground for exempting AFH live-in employees from the MWA's protections simply because they lived at the homes.

The privileges and immunities clause "reasonable ground" test is stricter than a rational basis review. *Martinez-Cuevas*, 196 Wn.2d at 523. A reviewing court must scrutinize the distinction the legislature has made and determine whether that distinction in fact serves the legislature's goal. *Schroeder v. Weighall*, 179 Wn.2d 566, 574, 316 P.3d 482 (2014). The exemption here does not serve the legislative goal of protecting worker health and safety that underlies the entire MWA, including its exemptions. *Martinez-Cuevas*, 196 Wn.2d at 525. In fact, the exemption does the opposite as demonstrated by the undisputed facts.

Both AssureCare and the dissent argue that state regulations require AFHs to have live-in employees. That is false. The regulations require that there is always someone available to care for the residents. This requirement can be met by hiring non-live-in

workers who can work separate shifts throughout the day and night to provide that coverage. Instead of exercising that option, AssureCare has the caregivers here work not only during the day but also make themselves available during their sleeping hours to respond to residents' needs. This is exactly the type of work practice that the MWA was enacted to prevent. *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 870, 281 P.3d 289 (2012) ("[M]inimum wage laws have a remedial purpose of protecting against 'the evils and dangers resulting in wages too low to buy the bare necessities of life and from long hours of work injurious to health.'" (internal quotation marks omitted) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 361, 65 S. Ct. 295, 89 L. Ed. 301 (1945))).

Yet, AssureCare still argues that this exemption is needed because it cannot afford to meet the requirements of the MWA. It argues that AFHs provide a family-like setting for the residents and that residents benefit by having the option of living in an AFH. It argues that if AFHs are required to abide by the MWA's requirements, many will be unable to do so for economic reasons and will be forced to close. Assuming all of these assertions are true, our constitution still requires the legislature to protect workers who work in conditions deleterious to their health. This exemption does the opposite. This exemption, as applied to AFH live-in caregivers, violates article I, section 12 of our constitution.

When viewing this exemption, we also cannot turn a blind eye to its origins and to the reality of who is deprived of working protections because of it.

15

Washington's MWA is modeled after the Fair Labor Standards Act of 1938

(FLSA). The act was created to give workers minimum wage and overtime pay

protections, as well as a private right of action against covered employers. 29 U.S.C.

§§ 206, 207, 216; *Anfinson*, 174 Wn.2d at 868. However, Congress did not want

everyone to receive the FLSA protections. Specifically, Congress openly intended to

exclude Black, Brown, and women workers from the FLSA's protections.[3] In an attempt

to create a seemingly race-neutral exclusion, Congress excluded agricultural and

domestic workers from the act's coverage—workers who were predominantly people of

color, women, and immigrants.[4] Washington eventually adopted the MWA, modeled

---

[3] 82 Cong. Rec. App. at 442 (1937) ("The organized Negro groups of the country are supporting [the FLSA] because it will . . . render easier the elimination and disappearance of racial and social distinctions . . . .") (statement of Rep. E.E. Cox)); *see* Amici Curiae Br. of Am. C.L. Union of Wash. Found., Ctr. for Civ. Rts. & Critical Just., Nat'l Emp't L. Project, Nat'l Women's L. Ctr., Nat'l Domestic Workers All. & Pilipino Workers Ctr. (Br. of Amici) at 7; *see also* Juan F. Perea, *The Echoes of Slavery: Recognizing the Racist Origins of the Agricultural and Domestic Worker Exclusion from the National Labor Relations Act*, 72 Oꜱɪᴏ Sᴛ. L.J. 95-100 (2011); Evelyn Nakano Glenn, *From Servitude to Service Work: Historical Continuities in the Racial Division of Paid Reproductive Labor*, 18 Sɪɢɴꜱ: J. ᴏꜰ Wᴏᴍᴇɴ ɪɴ Cᴜʟᴛᴜʀᴇ ᴀɴᴅ Sᴏᴄ'ʏ 1-43 (1992).
[4] *See* Br. of Amici at 6-15 (overview of the history of the FLSA's exclusions); *Martinez-Cuevas*, 196 Wn.2d at 528-31 (González, J., concurring) ("[P]roponents of President Roosevelt's New Deal agenda made compromises to preserve a quasi-captive, nonwhite labor force and perpetuate the racial hierarchy in the South by excluding agricultural workers."); *see* Glenn, *supra*, at 14 ("The dominant group ideology in all these cases was that women of color—African American women, Chicanas, and Japanese American women—were particularly suited for service. These racial justifications ranged from the argument that Black and Mexican women were incapable of governing their own lives and thus were dependent on whites—making white employment of them an act of benevolence—to the argument that Asian servants were naturally quiet, subordinate, and accustomed to a lower standard of living. Whatever the specific content of the racial characterizations, it defined the proper place of these groups as in service: they belonged there, just as it was the dominant group's place to be served.").

after the FLSA, and in doing so, carried over the agricultural and domestic worker exemptions. *See Anfinson*, 174 Wn.2d at 868.

Many workers in the AFH industry are people who have historically been marginalized and who continue to have less power to gain workplace protections. People of color, women, and immigrants are overrepresented in the home caregiving workforce. These jobs are among the lowest paid in the country. These nationwide trends are reflected in Washington's workforce. The live-in worker exemption for AFH caregivers perpetuates race and sex discrimination by keeping wages low and hours high for historically marginalized groups.

Indeed, the story of the caregivers here reflects how exclusions from wage and labor protections disproportionately harm people of color, women, and immigrants. The caregivers in this case share some of these characteristics. According to AssureCare's own declarations, if it was not for their employment in the AFHs, the caregivers would not have a place to live. Some of the caregivers slept on the floor and in recliners at the AFHs. One testified to putting up cardboard next to them while they slept so no one would watch them. Because of the live-in worker exemption to the MWA, AssureCare was able to subject the caregivers to difficult living and working conditions while avoiding minimum wage, overtime, and meal and rest break requirements.

As we hold today, this exemption violates our state's constitutional protection for workers and is wrong.

III.
CONCLUSION

No one will dispute that having a place that is similar to a home for individuals who cannot live independently is beneficial for the residents and society. However, the cost of providing those facilities cannot be placed on the backs of workers. Our state constitution requires the legislature to enact laws to protect workers whose jobs put their lives at risk or whose work is deleterious to their health.

Our state's MWA was passed to protect the health, safety, and welfare of workers. Our state has determined that working more than 40 hours a week and working without uninterrupted breaks is not healthy for workers. Employers are discouraged from having their workers work more than 40 hours a week by having to pay them overtime wages. Without the protections of the MWA, some employers will use their economic power to require their workers to work excessively long hours, work without uninterrupted breaks, and work more than 40 hours a week, all for less than minimum wage. Reviewing the undisputed facts presented in this case, that was what happened here.

I agree with the majority that exempting AFH live-in workers from the MWA violates article I, section 12 of our constitution.

The trial court's grant of summary judgment should be affirmed.

_____
Mungia, J.

_____
González, J.

_____
Gordon McCloud, J.

*Bolina v. Assurecare Adult Home LLC*

No. 103519-5

JOHNSON, J. (dissenting)—The caregivers raise legitimate concerns about their workplace conditions. However, considering the underdeveloped record and the procedural posture of this case, I cannot join the majority's broad, categorical holding. The plaintiffs—live-in caregivers at adult family homes in Washington—sued their employer for violating the Washington Minimum Wage Act (MWA), ch. 49.46 RCW. Because a statutory exemption, former RCW 49.46.010(3)(j)(2013),[1] excludes them from the MWA's protections, the caregivers claim the exemption is unconstitutional, as applied to them, under Washington's privileges and immunities clause. The trial court granted the caregivers' motion for partial summary judgment, deciding that the exemption is unconstitutional as applied to them. A majority of this court now affirms. I respectfully dissent because the factual record is underdeveloped and insufficient to support such a conclusion at this stage in the proceedings.

---

[1] The current Washington legislative website lists the live-in exemption in subsection (4). I use the subsection in effect when the parties filed their motion.

In a summary judgment motion, the trial court must evaluate the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. If a genuine issue of material fact exists, then the motion must be denied. CR 56(c). The moving party bears the burden to show no factual question exists independent of whether the nonmoving party submits its own supporting evidence. The trial court must take all facts in the light most favorable to the nonmoving party. If reasonable people could reach different conclusions regarding a material fact, the motion must be denied. *Jacobsen v. State*, 89 Wn.2d 104, 108-09, 569 P.2d 1152 (1977), *abrogated in part on other grounds by Peeples v. Port of Bellingham*, 93 Wn.2d 766, 613 P.2d 1128 (1980). The majority flips this presumption, essentially finding all allegations are established where, here, nothing has been proved about the working conditions of these plaintiffs or those of the putative class—a material factual issue in this case. Declaring a statute unconstitutional requires more. *See, e.g., Island County v. State*, 135 Wn.2d 141, 147, 955 P.2d 377 (1998) ("we are hesitant to strike a duly enacted statute unless fully convinced, after a searching legal analysis, that the statute violates the constitution").

The majority relies on article II, section 35 to reach its holding. That constitutional provision states, "PROTECTION OF EMPLOYEES. The legislature shall pass necessary laws for the protection of persons working in mines, factories and other employments dangerous to life or deleterious to health." At the time this

provision was crafted, the authors sought to address notoriously dangerous working conditions and work-related violence for miners and factory workers.[2] This court has recognized that the provision is not limited to miners and factory workers. *See, e.g.*, *Martinez-Cuevas v. DeRuyter Bros. Dairy*, 196 Wn.2d 506, 475 P.3d 164 (2020). We ground our determination of whether a specific type of employment is entitled to constitutional protection in the provision's original purpose: to ensure health and safety protections for extremely dangerous work. *Martinez-Cuevas*, 196 Wn.2d at 521 ("The extremely dangerous nature of dairy work entitles dairy workers to the statutory protection set out in article II, section 35."). Before concluding, at the summary judgment stage, that a certain type of employment is sufficiently dangerous and deleterious to health, courts must conduct a careful, fact-based analysis looking at the specific characteristics of the profession and accompanying risks to be certain that no genuine issue of material fact exists. This is especially true when the nonmoving party disputes that working conditions of the putative class qualify for constitutional protections under article

---

[2] Indeed, as a historical analysis of article II, section 35 has found, through this provision, "the convention sought to provide for the protection of labor. During the time preceding the convention there had been violent disturbances at mining camps in Roslyn and Newcastle when mining companies hired armed guards to attack striking miners. The working conditions at some industrial concerns in the territory were notoriously dangerous, and organized labor lobbied for a constitutional provision requiring the legislature to enact health and safety laws." ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION 82 (2d ed. 2013)(citations omitted).

II, section 35, and when the party provides evidence supporting its position. *Jacobsen*, 89 Wn.2d at 108 (stating that the moving party must prove by uncontroverted facts that no genuine issue of material fact exists); *Martinez-Cuevas*, 196 Wn.2d 506 (providing guidance for the analysis under these circumstances).

Our careful approach to article II, section 35 in *Martinez-Cuevas* reflects the important considerations that the provision balances. Article II, section 35 simultaneously requires that the legislature protect employees in extremely dangerous professions while also preserving the legislature's plenary police power to decide how to best provide these protections. *Wash. State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 174 P.3d 1142 (2007) (affirming that the legislature has plenary power to enact laws not prohibited by the state or federal constitutions). The majority's holding infringes on the legislature's police power, upsetting this balance in contravention of article II, section 35's plain grant of discretion to amend or repeal necessary laws. The constitutional directive was never meant to micromanage the legislative process by impeding the legislature's authority to solve problems piece by piece.

The majority ignores the fact that the legislature has employed its plenary police power to ensure worker safety in the caregiving industry by imposing licensing requirements, administrative codes, and other worker protection

statutes—including the Washington Industrial Safety and Health Act of 1973 (WISHA), ch. 49.17 RCW. For example, WISHA requires employers to provide a safe workplace free from hazards that would cause injury to their employees. RCW 49.17.060. WISHA was enacted to ensure safe and healthy working conditions for every individual working in Washington. RCW 49.17.010. Live-in workers are not exempt from WISHA. Additionally, statutes that protect residents at adult homes also protect workers residing in those homes. By not addressing the employee protections that currently exist for live-in caregivers, the majority inaccurately characterizes the MWA as the only statutory framework protecting the health and safety of these workers.  This conclusion, reached without a fully developed evidentiary record, intrudes on the legislature's plenary police power to solve problems one step at a time.

We addressed a similar matter in *Martinez-Cuevas*, where this court considered whether a specific MWA exemption was unconstitutional. The factual record was substantially more developed than the one we have before us here, and the dangerous working conditions of the dairy workers was undisputed by the defendant. In that case, the plaintiff dairy workers connected the dangerousness of their specific profession to the MWA's agricultural worker exemption. Rather than showing a general high risk of injury to all agricultural industry workers, the plaintiffs specifically demonstrated that their profession—dairy work—is an

extremely dangerous occupation. For example, they provided statistics specific to dairy work showing an injury rate 121 percent higher than all other state industries combined and 19 percent higher than the entire agricultural industry. The dairy workers claimed they were entitled to overtime pay and showed specific evidence that working overtime as a dairy worker resulted in a 61 percent higher rate of injury. Consequently, this court concluded that the agricultural exemption to the MWA, as applied to dairy workers, violated article II, section 35 because the plaintiffs in that case provided substantial and specific evidence that they were constitutionally entitled to MWA protections. A well-developed, undisputed record was critical to our holding in *Martinez-Cuevas*, something that is not present here.

Here, in one giant leap, the majority concludes that the live-in caregivers occupy an extremely dangerous profession despite an absence of statistics pertaining specifically to live-in caregivers and in spite of evidence provided by AssureCare supporting a different conclusion. Although the caregivers presented some statistics showing that caregiving can result in increased risk of injury and disease, the data was generalized to a broader category of workers in a variety of settings. For instance, the caregivers' expert witness stated that long-term careworkers face an elevated risk of occupational injury. To support this opinion, the expert cited multiple studies looking at injury risk to workers in nursing homes and other settings. The workers included nurses, nursing assistants, and direct

caregivers. The report consistently extrapolated its conclusion from generalized data about caregivers broadly to the substantially more specific category of live-in caregivers. A record comprising this data is insufficient because nursing homes and other types of long-term care facilities follow a completely different employment and care model and moreover, individuals working in those facilities are not exempt from the MWA. Unlike other forms of long-term care facilities, adult family homes, like the ones where the plaintiffs work, require at least one live-in caregiver. Additionally, nursing homes and assisted living facilities generally require a higher level of care for their residents than adult family homes.

The caregivers also presented data from the Washington Department of Labor and Industry's risk classification system. The risk classification system is used to set insurance rates based on *employers* with similar risks. Adult family home employers are included in a risk class with several other types of care facility employers. However, the individuals working in those facilities cover a broad range of occupations, including activity directors, cooks, counselors, dietitians, janitors, nurses, social workers, waitstaff, and caregivers. Data pulled from the risk classification report does not differentiate between live-in caregivers and other occupations. While some overlap may exist, the plaintiffs do not offer sufficient evidence that their specific employment constitutes an extremely dangerous profession for the purpose of applying article II, section 35. Without specific data

looking at the risk of occupational injury in adult family homes for live-in caregivers, a genuine issue of material fact exists regarding the actual dangerousness of live-in caregiving. Without further development of the record, we cannot determine whether the conditions faced by live-in caregivers match or exceed the general statistics for all adult caregivers. Such a determination is appropriately reserved for the trial court after reviewing a more expansive and specific record.

The majority, relying on an underdeveloped and challenged factual record, prematurely concludes that the exemption in this case is unconstitutional with no discernible limiting principle. Further, the procedural posture here distinguishes this case from our previous cases on this issue. Even if the plaintiffs met the initial burden of their motion, AssureCare established sufficient doubt to survive summary judgment. I cannot join the majority's holding because it could have far-reaching effects on whether other exemptions are deemed unconstitutional. Thus, I dissent.

_____
Johnson, J.